# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FLOYD LANDIS, | |
| Plaintiffs, | Civil Action No. 1:10-cv-00976-CRC |
| v. | **ECF** |
| TAILWIND SPORTS CORP., *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
LANCE ARMSTRONG'S MOTION TO EXCLUDE TESTIMONY OF
LARRY GERBRANDT, BRIAN TILL, AND JONATHAN WALKER**

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     LEGAL STANDARD............................................................................................4

III.    MOTION TO EXCLUDE LARRY GERBRANDT.............................................5

        A.      Gerbrandt's Background and Experience ..................................................5

        B.      Summary of Gerbrandt's Work and Report...............................................6

        C.      Argument ...................................................................................................9

                1.      Gerbrandt is not qualified to opine on alleged harm to the USPS. .............9

                2.      Gerbrandt's opinions on the alleged harm to the USPS are not
                        based on reliable scientific methods or principles. ...................................11

                        a.      Gerbrandt's opinion that "negative" publicity harmed the
                                USPS is not based on any underlying science or
                                methodology. .................................................................................12

                        b.      Gerbrandt's media-impression-count is not the product of a
                                reliable methodology. ....................................................................13

                        c.      Gerbrandt failed to reliably apply any methodology to the
                                facts of this case. ..........................................................................15

                3.      Gerbrandt's proposed testimony impermissibly invites the jury to
                        speculate................................................................................................16

                4.      Gerbrandt's opinion that the cycling-team sponsorship has "no
                        market value" is irrelevant and will not assist the trier of fact. ................18

                5.      Gerbrandt is unqualified to opine on the USPS's earned-media
                        reports, and his opinions are not reliable or well-reasoned. .....................19

IV.     MOTION TO EXCLUDE BRIAN TILL ...........................................................21

        A.      Till's 1998 Research .................................................................................23

        B.      Argument .................................................................................................25

                1.      Till's opinions are not the product of reliable principles and
                        methods....................................................................................................25

                        a.      Till failed to conduct any tests, research, or analysis. ...................25

|  |  | b. | Till ignored data directly relevant to his associative learning theory. | 28 |

|  | 2. | Till failed to reliably apply any principles or methods to the facts of this case | 31 |

|  | 3. | Till's opinions are irrelevant will not assist the trier of fact. | 32 |

V. | MOTION TO EXCLUDE JONATHAN WALKER | 32

A. | Walker's Background and Experience | 32

B. | Argument | 35

|  | 1. | Walker's entire report is premised on an irrelevant damages standard. | 35 |

|  | 2. | Walker admitted that it was "impossible" to apply event study methodology to ascertain actual harm to the Postal Service as a result of PED use. | 36 |

VI. | CONCLUSION | 37

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Ambrosini v. Labarraque*
    101 F.3d 129 (D.C. Cir. 1996) (J. Henderson dissenting) ........................................................18

*Burkhart v. Washington Metro. Area Transit Auth.*
    112 F.3d 1207 (D.C. Cir. 1997) ...................................................................................18, 35

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*
    78 F. Supp. 3d 208, 220-21 (D.D.C. 2015)...............................................................17

*Daubert v. Merrell Dow Pharms., Inc.*
    509 U.S. 579 (1993)...............................................................................3, 4, 5, 11, 13

*Doe v. TCI Cablevision*
    2000 WL 35715278 (Mo. Cir. 2000)........................................................................25, 26

*Estate of Gaither v. District of Columbia*
    831 F. Supp. 2d 56 (D.D.C. 2011)..................................................................4, 15, 19

*Gilmore v. Palestinian Interim Self-Government Auth.*
    53 F. Supp. 3d 191, 212 (D.D.C. 2014)..................................................4, 22, 31, 32

*Joy v. Bell Helicopter Textron*
    999 F.2d 549 (D.C. Cir. 1993)..................................................................2, 4, 11, 17

*Kumho Tire Co., Ltd. v. Carmichae*
    526 U.S. 137 (1999)..................................................................................... *passim*

*Lewis v. Booz-Allen & Hamilton, Inc.*
    150 F. Supp. 2d 81 (D.D.C. 2001).............................................................................36

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................................4, 13

*Meister v. Med. Eng'g Corp.*
    267 F.3d 1123 (D.C. Cir. 2001)...................................................................................4

*Raynor v. Merrell Pharms.Inc.*
    104 F.3d 1371 (D.C. Cir. 1997)..................................................................10, 13, 36

*Rothe Dev., Inc. v. Dept. of Defense*
    107 F. Supp. 3d 183, 196, 202-03 (D.D.C. 2015).....................................................9

*Sykes v. Napolitano*
    634 F. Supp. 2d 1 (D.D.C. 2009)..............................................................................25

*United States ex rel. Ervin & Assocs. v. Hamilton Sec. Grp.*
  370 F. Supp. 2d 18 (D.D.C. 2005) ............................................................17

*United States v. Sci. Applications Int'l Corp.*
  626 F.3d 1257 (2010) ..........................................................................1, 7, 36

*United States v. Stagliano*
  729 F. Supp. 2d 222 (D.D.C. 2010) ........................................................22

**Federal Rules**

Fed. R. Evid. 401 ...........................................................................................23, 32

Fed. R. Evid. 403 .....................................................................................3, 4, 17, 19

Fed. R. Evid. 702 ..............................................4, 9, 11, 14, 15, 17, 18, 19, 20, 22, 23, 32, 36

## I.     INTRODUCTION

As the Court is well aware from the summary judgment proceedings, the government's ambition to prove damages (beyond statutory penalties) hangs by the thread of its expert witnesses. This motion addresses the admissibility of the testimony of Larry Gerbrandt, Brian Till, and Jonathan Walker, taking each in turn.  But at the outset we make a more general observation about the government's expert strategy, and how, even if admissible, it would be insufficient to prove damages and therefore must be excluded. The fact of harm and the amount of damages cannot rest on speculation. Yet, the government's experts never lay any foundation upon which a trier of fact could do anything but speculate as to the fact of and amount of damages.  Both because it is incomplete and inadequate as a whole, and also because each of its component parts are separately inadmissible, the government's strategy to use these so-called experts to establish damages is doomed to fail. The Court should grant this motion in its entirety, leaving alive only the question of statutory penalties under the False Claims Act and any equitable remedy based on unjust enrichment.

Armstrong has presented to the Court substantial quantities of contemporaneous factual evidence showing the extraordinary benefits the USPS received from the sponsorship. *See* ECF No. 514 at 17-24 (Armstrong Motion for Summary Judgment). Those benefits likely continued during the eight years after the end of the sponsorship, prior to Armstrong's 2013 admissions of PED use. Under the Court's correct interpretation of *United States v. Sci. Applications Int'l Corp.* 626 F.3d 1257 (2010) ("SAIC"), the government must prove the amount it paid under the sponsorship exceeds the dollar value of the benefits received. None of the government's experts address this question. Nor can their proposed testimony, even taken together, address it. Fundamentally, the government seeks permission to allow a jury to speculate regarding the fact of harm and amount of damages with no reliable scientific basis to do so.  Courts regularly and appropriately exclude such expert testimony.

1

Mr. Gerbrandt's opinions, even if taken at face value (which they cannot be, see below), are unreliable and unhelpful to the jury and should be excluded. Mr. Gerbrandt (or the USPS) hired someone else to count the number of "stories" (including blog posts, YouTube videos and social media postings) that mentioned Armstrong, USPS and doping. That is pretty much it. Mr. Gerbrandt explicitly testified that he did not attempt to quantify in dollars and cents any alleged harm to the USPS caused by these incidents. Declaration of Elizabeth McCloskey, Ex. 3. at 93:9-16, 94:17-20 (Gerbrandt Depo)[1]. He relies on no recognized methodology or body of knowledge in concluding that these media impressions were "negative" or caused any harm. Moreover, Mr. Gerbrandt is not qualified to opine that there was any such harm. There is no generally recognized methodology or body of knowledge tending to establish that negative publicity about an athlete who competed for a team which was sponsored, eight years after the end of a sponsorship, causes any quantifiable economic harm to the sponsor. To the contrary, there *is* research tending to show that such publicity causes no harm, and may be beneficial. *See, e.g.,*Ex. 8 (Depo. Ex. 733). There is therefore no reliable basis for the inference that publicity in 2014 or 2015 about Armstrong having used performance enhancing substances had any impact on the USPS. And even if it did, there is not a shred of evidence anywhere in the government's expert lineup of the quantum of pecuniary harm caused, which would be necessary for a jury to net out against the benefits received by the USPS.

The government would like to offer Mr. Gerbrandt's counting exercise and allow the jury to speculate that the USPS suffered harm as a result of the summary and that such harm exceeded the benefits the USPS enjoyed under the sponsorship. The jury cannot be allowed to speculate on this critical issue. *Joy v. Bell Helicopter Textron*, 999 F.2d 549, 569 (D.C. Cir. 1993). The absence of an evidentiary predicate for the jury's evaluation of Mr. Gerbrandt's

---

[1] All exhibits referred to herein are attached to the Declaration of Elizabeth K. McCloskey in Support of Defendant Lance Armstrong's Motion to Exclude, filed currently herewith.

summary makes it inadmissible and unduly prejudicial under Fed. R. Evid. 403. It is tethered to nothing.

The testimony of Drs. Brian Till and Jonathan Walker do not address or resolve these fundamental deficiencies. Dr. Till submitted a four-page report, mostly consumed with his background credentials and the few materials about this case he reviewed. Dr. Till claims to have concluded that negative publicity about a sponsored person can harm a sponsor. But whether or not negative publicity *could* harm a sponsor, Dr. Till has done nothing to determine whether the USPS was *actually* harmed and if so to what extent. Moreover, he makes no effort to quantify such harm, or compare it to the benefits the USPS received from sponsoring the cycling team— benefits he acknowledges. In the absence of any real methodology or analysis, Dr. Till's conclusions must be excluded, since they are based on nothing more than the *ipse dixit* of the expert.

The proposed testimony of Dr. Walker also has to go. Dr. Walker pretends to perform an "event study," based on fictitious, invented data, since actual event studies apply to companies with public share prices, and the USPS is not publicly traded and has no public share price. No known expert has ever tried the methodology Dr. Walker utilizes and it finds no home or support in any academic or accounting literature. It is a sham. The Court should exclude Dr. Walker's testimony.

We proceed now to discuss in greater detail the shortcomings of the experts Gerbrandt, Till, and Walker under the applicable legal standards enunciated in *Daubert v. Merrell Dow Pharms., Inc.* 509 U.S. 579 (1993), *Kumho Tire Co., Ltd. v. Carmichae,* 526 U.S. 137 (1999) and their progeny. The experts should all be stricken. Even if they are not, and some portion of their putative testimony remains, the government's hope that it may ask the jury to speculate, without a sufficient evidentiary foundation, on the critical issue of damages, is fatal to its lofty damages ambitions in this case. The Court should rule accordingly and in so doing will appropriately streamline these proceedings.

3

## II.    LEGAL STANDARD

The proponent of expert testimony bears the burden of proving admissibility. *Meister v. Med. Eng'g Corp.,* 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001). In deciding whether the proponent has carried that burden, the trial court has a duty to ensure that expert "testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589.

The reliability of an expert's testimony depends upon factors including whether: (1) "the [expert's] testimony is based on sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. While the reliability inquiry is flexible, in all cases the trial judge must determine that the proffered expert testimony "'is properly grounded, well-reasoned and not speculative before it can be admitted.'" *Estate of Gaither v. District of Columbia*, 831 F. Supp. 2d 56, 62 (D.D.C. 2011) (quoting FRE 702 Advisory Committee Notes (2000 amends.)).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157  (citation omitted). It is well settled that speculative expert damages testimony is inadmissible. *Joy*, 999 F.2d at 569.  Moreover, an expert who does "not reliably appl[y] his own methodology to the facts of the case" will not be permitted to testify. *See Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191, 212 (D.D.C. 2014); *see also see also Louis Vuitton Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 653-54 (S.D.N.Y. 2007) (excluding damages expert on the grounds that he had failed to describe any reliable methodology, nor any basis, for his conclusions).

Finally, Federal Rule of Evidence 403, which bars evidence that is prejudicial, confusing, irrelevant, or misleading, also guides the Court in its gatekeeping function. Indeed, because expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it . . . the judge in weighing possible prejudice against probative force under Rule 403

4

. . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation omitted).

### III.    MOTION TO EXCLUDE LARRY GERBRANDT

#### A.    Gerbrandt's Background and Experience

Mr. Gerbrandt has been a professional witness for more than twenty years. Based in Southern California, he most frequently opines on "media content," such as television programming. *See* Ex. 2 (Gerbrandt depo at 50:13-23). Mr. Gerbrandt is not a CPA. *Id*. at 45:2-23. He does not have an MBA. *Id.* He does not have any type of economics degree, statistics degree, or credentials in valuation, marketing, or forensic accounting. *Id*. at 45:2-46:3. Mr. Gerbrandt's highest level of schooling is a college degree, although its provenance is not accurately set forth in his CV.  *Id*. at 33:24-37:17.

Mr. Gerbrandt has no experience assessing the benefits derived by a sponsor from the sponsorship of a sports team. *Id*. at 60:25-61:4. He has no experience valuing the effects of negative publicity on the value of the sponsorship of a sports team. *Id*. at 63:16-20. Mr. Gerbrandt has no familiarity with any academic literature regarding the valuation of a sponsorship. *Id*. at 74:1-4. Mr. Gerbrandt became familiar with the methodology for valuing the free media derived from a sponsorship by reading the reports commissioned by the USPS, including those prepared by IEG, Campbell-Ewald ("CE") and FCB Sports Marketing ("FCB"), after he was retained as an expert in this case. *Id*. at 74:9-12, 76:18-23. Mr. Gerbrandt has never before been asked to determine whether negative publicity regarding an individual on a sponsored team harmed the sponsor. *Id*. at 80:20-23. He is not familiar with any generally accepted methods for determining whether negative publicity about an individual on a sponsored team harmed a sponsor. *Id*. at 82:2-12. He is not familiar with any studies or generally accepted method for determining how long an association between a sponsor and an athlete who competed for a sponsored team lasts. *Id*. at 85:3-18. He did not conduct or rely in any way on any type of survey conducted in this case. *Id*. at 85:20-86:9.

### B.    Summary of Gerbrandt's Work and Report

Mr. Gerbrandt's work consisted of the following: (**1**) Firms retained by the USPS or Mr. Gerbrandt searched for television shows, newspaper articles, and radio segments (among other forms of media), that appeared from 2010 to 2014 that included the terms "Lance Armstrong," "doping"[2] and "USPS,"[3] and counted the number of such references. (**2**) Without performing any meaningful review of the results of this counting exercise,[4] Mr. Gerbrandt transformed the numbers of media reports identified into "impressions"—specifically, 1.5 billion impressions across all media except the Internet, and another 154 billion impressions on the Internet. (**3**) Mr. Gerbrandt concluded that *all* of those impressions were "negative"—without performing any meaningful review of the impressions themselves or relying on a generally accepted meaning for that term. (**4**) Then, without relying on *any methodology whatsoever*—and without considering any of the benefits the USPS actually received as a result of the sponsorship—Mr. Gerbrandt concluded that because all "negative" media is harmful (an unwarranted and unsupported conclusion), the totted-up impressions must have harmed the USPS, and that this harm must have outweighed the value of benefits received (though he never actually valued either the harm or the benefits, or even gave any thought to any of the benefits).

Mr. Gerbrandt describes all media reports which mention Armstrong, the USPS and doping as "negative," regardless of whether those reports actually contained any commentary, negative or otherwise, regarding the USPS. Ex. 1 ¶ 7. He does not value in dollars or cents, or quantify in any other economic sense, the "negative" impressions. Ex. 2. at 93:9-16, 94:17-20. He states in his report that the amount of "negative" publicity was "unprecedented" and "extraordinary," but then admits that those adjectives have no generally accepted meaning in his

---

[2] Variations included "doped," "dope," "doper," "EPO," "blood," "drugs," or "performance enhancing". Ex. 1 (Gerbrandt Report) ¶ 53 n.36.

[3] Variations included "U.S.P.S." or "postal." *Id.* ¶ 53 n.36.

[4] Gerbrandt testified that he merely "did spot checks and looked for outlier data points." Ex. 3 at 18:3-20:11.

field. *Id*. at 95:8-14. While Mr. Gerbrandt expresses his conclusion that certain publicity was "negative," he is both unwilling and unable to discuss whether any media reports were "positive" or conveyed any benefits on the USPS. He states that he was not asked to consider whether the USPS received any value from sponsoring the cycling team and that he did not do so. *Id*. at 98:5-17, 114:25-118:25. In the next breath however, Mr. Gerbrandt testified that he "netted out" the positive and negative exposure, and therefore had to consider the positive exposure. *Id*. at 99:16-100:22. Mr. Gerbrandt testified that the amount of negative publicity surrounding Mr. Armstrong's doping "would have swamped any positive value that was created." *Id*. at 99:7-100:6. When asked how he could conclude that the negative publicity outweighed the positive publicity when he had never considered the value of the positive publicity, Mr. Gerbrandt testified simply that "nobody would pay for that amount of negative publicity." *Id*. at 101:14-25. Of course at this point, Mr. Gerbrandt was ascribing knowledge of information which came to light in 2013 (Mr. Armstrong's doping) with a decision which had been made in 1996 and then again in 2000 (whether USPS should sponsor the cycling team). Mr. Gerbrandt was not able to explain this temporal anomaly. *Id*. at 102:1-112:6. Moreover, Mr. Gerbrandt's "nobody would have paid for it" argument was addressing a damages theory specifically rejected by controlling D.C. Circuit law, as well as by this Court. *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1279 (2010) ("SAIC"); ECF No. 547 at 25-28.

While willing to conclude that articles after 2010 mentioning Mr. Armstrong, the USPS and doping were "negative," Mr. Gerbrandt was unable or unwilling to express an opinion on whether articles, for example, depicting Armstrong on the cover of Sports Illustrated wearing the USPS jersey after multiple Tour de France victories benefited the USPS or were in any way "positive." Ex. 3 at 114:25-119:25. Indeed, Mr. Gerbrandt was shown a photo of Mr. Armstrong from a media report wearing the USPS jersey and asked whether the photo was negative or positive. He said that depended on the context. He was then told to assume the photo appeared in the context of and at the time of Armstrong's winning the Tour de France. Mr. Gerbrandt then

7

testified that he could not say whether that photo benefited the USPS. However, according to Mr. Gerbrandt, if the exact same photo appeared in a story which mentioned doping, then it was "negative" and harmed the USPS. *Id*. at 123:21-127:23. Mr. Gerbrandt relies on no methodology for these conclusions, simply his own mental process. *Id*. at 132:19-137:7 (The "*ipse dixit*" of the expert. *Kumho Tire Co.*, 526 U.S. at 157).

Finally, although Mr. Gerbrandt has never prepared a report that evaluates nonpaid media exposure resulting from a sponsorship, *Id*. at 150:5-8, he opined that the USPS's CE and FCB reports overestimated the value of nonpaid media exposure received by the USPS. *Id*. at 148:17-21, Ex. 1 ¶ 28.[5] Mr. Gerbrandt claimed that the reports inappropriately commingled different kinds of media, such as local and national media (Ex. 3 at 150:17-161:23); valued print coverage based on standard cost per thousand ("CPM") impressions, rather than a number that reflected the number of unique visitors, demographics, and types of publications (*Id*. at 175:12-176:16, 185:24-187:9, Ex. 1 ¶ 34); arbitrarily counted articles with two mentions of USPS as the equivalent of a quarter page ad, rather than ascribing a value based on column inches of each article (Ex. 2 at 183:10-185:10, Ex. 1 ¶ 34); and, "[m]ost egregiously," failed to ensure that each print article was only counted once (Ex. 3 at 192:22-193:6, Ex. 1 ¶ 35-37). Mr. Gerbrandt, however, made no effort to recalculate the value of the publicity the USPS received as a result of the cycling-team sponsorship. Ex. 3 at 207:22-209:18. And importantly, none of his nitpicks of the CE and FCB reports rely on any generally-accepted methodology.

---

[5] Earned-media reports such as those commissioned by the USPS and performed by CE and FCB estimate what it would have cost the USPS to buy the exposure actually received, and then applies a discount factor to conservatively estimate the benefit to the USPS, *i.e.* what it would have cost to buy the same exposure. As described herein, there is no recognized methodology to value "negative" publicity. This makes sense. Because advertising is an opportunity to influence a target audience, but not a guarantee that it will do so, simply counting allegedly 'negative' impressions tells you nothing. There is no evidence that it actually impacted any target audience, and because no advertiser would ever buy 'negative' exposure it is not evidence of a cost borne by the USPS.

### C.    Argument

Mr. Gerbrandt's opinions should be excluded for the following five separate and independent reasons: ***First***, Mr. Gerbrandt is not qualified to testify regarding any alleged harm to the USPS. ***Second***, Mr. Gerbrandt's opinion that the USPS was harmed has no scientific basis and is not based on any reliable methodology. ***Third***, even if Mr. Gerbrandt's counting exercise was based on reliable methodology (which it is not), it would not be helpful to the jury and would impermissibly require the jury to speculate regarding the amount of harm.  ***Fourth***, Mr. Gerbrandt's opinion that the sponsorship had "no value" addresses the wrong legal standard and should be excluded. ***Fifth***, Mr. Gerbrandt is not qualified to testify regarding the FCB and CE reports and, regardless, his opinions regarding them are not based on any reliable methodology.

### 1.    Gerbrandt is not qualified to opine on alleged harm to the USPS.[6]

The Court must determine as a threshold matter whether an expert is qualified to give the opinion he seeks to express. *Kumho Tire Co.*, 526 U.S. at 156. The proffered expert must have "sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Id.* (internal quotations and citation omitted). Where an expert lacks formal education in the relevant field, and instead purports to testify on the basis of experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000); *Rothe Dev., Inc. v. Dept. of Defense*, 107 F. Supp. 3d 183, 196, 202-03 (D.D.C. 2015) (citing cases, including *Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C. 2013) (finding expert was not qualified under Rule 702 because plaintiffs failed to demonstrate how expert's academic and professional experience made him qualified to testify about the factual questions at issue)).  Gerbrandt flunks all these tests.

---

[6] This opinion is primarily set forth in paragraphs 7-8, 23, 38-120 of Mr. Gerbrandt's report. *See* Ex. 1.

The government proffers Mr. Gerbrandt to opine that so-called "negative" publicity between 2010 and 2014 harmed the USPS and such harm exceeded the benefits the USPS enjoyed under the sponsorship. But whether such publicity benefited the USPS, harmed the USPS, or had no impact is entirely beyond the expertise of Mr. Gerbrandt. These opinions represent entirely new territory for Mr. Gerbrandt. Ex. 3 at 11:2-12, 122:7-17. Mr. Gerbrandt has no academic training in this field. *Id*. at 33:24-37:17, 45:2-46:3. He's never published academic (or other) articles in these areas, nor has his work been subject to peer review. *See, e.g., Raynor v. Merrell Pharms.*Inc., 104 F.3d 1371, 1375 (D.C. Cir. 1997) (citing cases which note that this factor "may be particularly important where conclusions have been drawn solely for purpose of litigation: a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office" (internal quotations and citations omitted)).

Moreover, Mr. Gerbrandt has never previously done what he claims to do here—value the effect of "negative" publicity on the value of the sponsorship of a sports team. Ex. 3 at 63:16-20. Mr. Gerbrandt has no experience assessing the benefits derived by a sponsor from the sponsorship of a sports team. *Id*. at 60:25-61:4. He has no experience valuing the effects of negative publicity on the value of the sponsorship of a sports team, *id*. at 63:16-20, and no familiarity with any academic literature regarding the valuation of a sponsorship. *Id*. at 74:1-4. Indeed, Mr. Gerbrandt has never determined whether negative publicity regarding an individual on a sponsored team harmed the sponsor. *Id.* at 80:20-23. Accordingly, Mr. Gerbrandt is unqualified to testify regarding alleged harm to the USPS and should be precluded from doing so.

10

### 2. Gerbrandt's opinions on the alleged harm to the USPS are not based on reliable scientific methods or principles.[7]

Expert testimony must be "the product of reliable principles and methods." Fed. R. Evid. 702(c); *Daubert*, 509 U.S. at 589-90 ("The subject of an expert's testimony must be 'scientific knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."); *see also Joy*, 999 F.2d at 568-69 (excluding expert testimony on damages on the grounds that it was based on guesswork, speculation, and conjecture).

Mr. Gerbrandt concludes that the value of one thing is more than the value of another, without ever valuing either thing. Specifically, he contends that the value of the "negative" publicity surrounding Mr. Armstrong's PED-confession necessarily outweighs the value of the positive publicity the USPS received as a result of the cycling-team sponsorship. Ex. 1 ¶ 8. But Mr. Gerbrandt concedes that this opinion is not based on *any* methodology. Ex. 3 at 134:7-137:17. He did not use a methodology to value the negative publicity the USPS received as a result of the cycling-team sponsorship, nor did he use a methodology to value—or even consider—the value of the positive publicity that the USPS received. For this reason alone, it should be excluded.

But Gerbrandt's methodological deficiencies run much deeper. As described in more detail below, Gerbrandt offers no reliable scientific basis to opine that "negative" publicity harmed the USPS and his underlying counting exercise is not based on any reliable scientific methodology. Moreover, even if that counting exercise had some basis in theory, he did not reliably apply the methodology to the facts. Quite simply, Mr. Gerbrandt's report is junk science and should be excluded.

---

[7] This opinion is primarily set forth in paragraphs 7-8, 23, 38-120 of Mr. Gerbrandt's report. *See* Ex. 1.

### a. Gerbrandt's opinion that "negative" publicity harmed the USPS is not based on any underlying science or methodology.

Mr. Gerbrandt's opinion that the USPS was harmed by the negative publicity about Mr. Armstrong is based on Mr. Gerbrandt's conclusion that "negative" publicity about an individual once sponsored by a brand harms that brand. Mr. Gerbrandt does not base this opinion on any research, methodology, or analysis. And for good reason: it's false. In fact, there is a long and accepted line of academic literature showing that negative publicity about a brand, or an individual sponsored by that brand, can have both positive and negative effects, and numerous factors—including the strength, reputation, and awareness of the brand, and the type and topic of publicity—control the effect of any 'negative' publicity.[8] In short, whether Mr. Gerbrandt's allegedly "negative" impressions even could have influenced consumer perceptions of the USPS requires a highly fact-intensive analysis—one that Mr. Gerbrandt made no attempt whatsoever undertake.

Mr. Gerbrandt all but admitted that he had done little more than guess that the USPS was harmed by the negative publicity he identified, and thus his opinion was not supported by any methodology. When asked to identify the methodology he relied upon to conclude that his impressions harmed the USPS, Mr. Gerbrandt merely claimed that it's a "given" in the publicity business that "negative publicity is always viewed as a harm." Ex. 3 at 134:7-135:1. But he then immediately conceded both that there are "exceptions to things" ("things" including, apparently, his claim that negative publicity is always viewed as a harm) and that he had made no effort to consider whether this "given" about the publicity business applied to the facts of this case. *Id. at* 135:2-137:17. Mr. Gerbrandt could not identify a methodology supporting his finding of harm because there isn't one—there is no science or social science which supports an expert

---

[8] *See, e.g.,* Positive Effects of Negative Publicity: When Negative Reviews Increase Sales, Marketing Science, Vol. 29, No. 5, September–October 2010, pp. 815–827, *available at* http://www.ssc.wisc.edu/~sorensen/papers/negative_publicity_2010.pdf; Ex. 9 (Till and Shimp, *Endorsers in Advertising: The Case of Negative Celebrity Information* (1998); Ex. 8 (Leeds, *Is bad news always bad: The impact of Floyd Landis's rise and fall on Phonak* (2006)

conclusion that negative publicity about an athlete who was on a team sponsored by a brand eight years earlier causes harm to that brand. Mr. Gerbrandt's analysis is thus not based on any accepted methodology that media impressions between 2010 and 2014 caused any harm to the USPS.

Mr. Gerbrandt's claim that his media impressions caused any harm to the USPS does not rest on a reliable foundation and is too speculative as a matter of law to present to the jury. It must be excluded. *See Daubert*, 509 U.S. at 597 (1993).

> **b.    Gerbrandt's media-impression-count is not the product of a reliable methodology.[9]**

Even if there was a reliable scientific basis or methodology to support Mr. Gerbrandt's opinion that all press post 2010 that mentioned the USPS, Armstrong, and doping was "negative" and harmed the USPS (which there is not), Mr. Gerbrandt's counting exercise itself is not based on any reliable methodology and should be excluded.  Mr. Gerbrandt opines that he counted 1.5 billion impression connecting Mr. Armstrong's "doping scandal" to the USPS across all forms of media except the Internet, and another 154 billion on the Internet. Ex. 1 ¶ 7(b). But his failure to use any reliable methodology to count these "impressions" provides an independent basis on which these figures must be excluded.  *See, e.g., Raynor*, 104 F.3d at 1376 (excluding expert testimony where his "methodology remain[ed] obscure"); *Louis Vuitton Malletier*, 525 F. Supp. 2d at 653-54 (excluding damages expert on the grounds that he had failed to describe any reliable methodology, nor any basis, for his conclusions).

Mr. Gerbrandt's report explains that a "common measure for all of the media is 'impressions,' or the number of times a message is presented to a viewer, reader or listener." Ex. 1 ¶ 7(b). But beyond this definition of an impression, Mr. Gerbrandt's report never addresses what generally-accepted methodology he used to count impressions. Mr. Gerbrandt's deposition testimony, however, fills in this gap: no methodology supports the impression count. Mr.

---

[9] This opinion is primarily set forth in paragraphs 7, 38-119 of Mr. Gerbrandt's report. Ex. 1

Gerbrandt first claimed to have relied on the "field of media measurement" to count impressions. Ex. 3 at 95:15-96:12. But his report never addresses the "field of media measurement,"[10] and Mr. Gerbrandt could only say that "most of the people" he works with think that the "field of media measurement is a science." Ex. 3 at 95:19-96:5. Mr. Gerbrandt then claimed to have relied on the "science of valuing intellectual property or other kinds of assets." *Id.* at 95:15-96:12. But, when asked whether the sponsorship of the cycling team involves intellectual property, Mr. Gerbrandt responded that the USPS logo is intellectual property—though, he conceded, his assignment in the case did not involve valuing the USPS logo (or any other IP). *Id.* at 96:15-25.

Mr. Gerbrandt's failure to rely on any methodology renders his impression-count unreliable and thus inadmissible. Fed. R. Evid. 702(c). Mr. Gerbrandt himself explains why his approach resulted in an unreliable media impression total. ***First***, as set forth in Mr. Gerbrandt's report, "impressions may be of a different length and each medium has advantages and disadvantages" and "[d]ifferent forms of media are [] more effective at reaching different target demographics." Ex. 1 ¶¶ 38-39. But although Mr. Gerbrandt used some kind of calculation to translate his raw data (articles) into "impressions"—he vaguely mentions, for example, considering the "reach" of articles and Nielsen viewing data for television, *Id.* ¶¶ 54, 57—he never disclosed what those calculations entailed and whether they took into account the advantages and disadvantages of various types of media, in particular as it relates to the USPS's objectives in entering into the cycling-team sponsorship. For example, he merely states that his 41,912 Internet articles translate into 154.4 billion impressions, and 3,825 print news articles translates into 465.6 million impressions, but provides no meaningful explanation for how he made those calculations. *Id.* ¶ 55. ***Second***, although Mr. Gerbrandt contends that the CE and FCB reports "most egregiously" failed to ensure the accuracy of the articles on which they relied,

_____

[10] Indeed, the term "media measurement" appears only once in Gerbrandt's report. Ex. 1

*Id.* ¶¶ 7(d), 35-36, Mr. Gerbrandt's impressions include numerous articles that have nothing whatsoever to do with Mr. Armstrong. *See* Part III.C.2.c.

Accordingly, Mr. Gerbrandt's impression count is not sufficiently reliable to be helpful to the jury; it is not properly grounded; it is not well-reasoned. It should be excluded. *See Estate of Gaither*, 831 F. Supp. 2d at 62.

### c.     Gerbrandt failed to reliably apply any methodology to the facts of this case.

The data upon which Mr. Gerbrandt relied on to reach his conclusion are so unreliable that even if he had applied a reliable method (which, as described above, he does not), it's clear that he did not reliably apply that method to the facts of this case, as required by Fed. R. Evid. 702(d).

Mr. Gerbrandt claims to have added up impressions which included the terms (or visual representations of) "Lance Armstrong," "doping" and "USPS" (and similar variations). Yet, Mr. Gerbrandt includes in his data set a host of impressions entirely unrelated to Armstrong. These impressions include articles about a FBI investigation into the death of Derek Williams, an individual in Milwaukee police custody,[11] and the introduction of wireless Internet service to schools in Wauwatosa, Wisconsin.[12] Mr. Gerbrandt's data set also contains numerous articles about relator Floyd Landis, including articles relating to Landis' suspended prison sentence from a French court for his role in a plot to steal documents from France's national anti-doping laboratory, and his agreement with U.S. federal prosecutors to repay individuals from whom he had fraudulently raised money to fund his fight against doping charges.[13] Other of Mr. Gerbrandt's impressions mention Armstrong only in passing (*see, e.g.,* cyclist Tyler Hamilton is

---

[11] http://archive.jsonline.com/newswatch/173523451.html.  The following articles are all cited in a spreadsheet produced by the government at Bates US00658759.

[12] http://www.jsonline.com/newswatch/173531401.html.

[13] *See, e.g.,* http://www.itworld.com/article/2734357/security/cycling-star-landis-sentenced-for-alleged-trojan-attack.html; http://abclocal.go.com/kfsn/story?section=news/sports&id=8784756.

15

stripped of his gold from the 2004 Athens Games, and Armstrong is mentioned only as the teammate of Viatcheslav Ekimov, who was awarded Hamilton's medal[14]), or not in a negative light.[15] For example, Mr. Gerbrandt includes a blog entry by political pundit Armstrong Williams in which Mr. Williams expresses admiration for the work ethic of athletes, such as Serena Williams and Lance Armstrong.[16] Mr. Gerbrandt concludes that all of his impressions are negative, both as to Armstrong and as to the USPS, yet he fails to account for the significant number of articles which don't even say anything negative about Armstrong—not to mention the USPS.[17]

Mr. Gerbrandt's failure to apply his (non-existent) methodology to the fact of this case provides yet another reason to exclude his opinion that the USPS was harmed as a result of publicity regarding Mr. Armstrong.

### 3.     Gerbrandt's proposed testimony impermissibly invites the jury to speculate.

Even if Gerbrandt was correct that articles published between 2010 and 2014 harmed the USPS (which he is not), and even if Gerbrandt's counting exercise was based on reliable methodology (it is not), Gerbrandt's opinions should nevertheless be excluded because the result of that counting exercise will not help the jury determine whether and to what extent the USPS was harmed.

The government intends to use Mr. Gerbrandt's testimony at trial to ask the jury to **infer** that the value of the harm to the USPS outweighed the value of the benefits it received. *See* MSJ Hrg. Tr. (11/2/2016) at 40:10-15 (COURT: What can a juror use to infer that the disclosures

---

[14] http://www.nbcwashington.com/news/sports/NATL-American-Tyler-Hamilton-to-be-Stripped-of-Athens-Gold-for-Doping-165559106.html

[15] *See, e.g.,* http://www.dailyherald.com/article/20120203/sports/120209957/).

[16] A separate blog entry by Mr. Williams, located at the same URL, mentions that the Postal Service "seems to be trending in the right direction."

[17] Mr. Gerbrandt conceded as his deposition that certain of these "impressions" were "false positives." Ex. 3 at 242:17- 244:4.

resulted in a diminution of benefits? MR. FINKELSTEIN: "[T]he jury could look at the negative media on its own and draw inferences based on the negative media."). This inference is 100% speculative; it is not based on any methodology, it lacks an adequate factual or analytical basis, and it would be unduly prejudicial and misleading. Fed. R. Evid. 403, 702; *Joy*, 999 F.2d at 570 ("Rule 702 permits an expert to testify only when scientific, technical, or other specialized knowledge will assist the trier of fact, . . . and that the word 'knowledge' connotes more than subjective belief or unsupported speculation.") (citation and quotation marks omitted); *see also Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*, 78 F. Supp. 3d 208, 220-21 (D.D.C. 2015) (excluding expert testimony where there was a "significant analytical gap between [the expert's] conclusion and the data on which he relies.").

To leave the jury to speculate that the media impressions counted up by Mr. Gerbrandt caused harm to the USPS—without any guidance regarding why and how the impressions harmed the USPS, if they indeed did cause harm, and how much harm they may have caused (if any)—would be highly improper and unduly prejudicial, and thus must be excluded pursuant to Federal Rule of Evidence 403. To prove damages with any "reasonable certainty," the government would have had to put forth an expert witness who had done the necessary case-by-case examination and could competently opine that Mr. Gerbrandt's impressions actually impacted the USPS. *See United States ex rel. Ervin & Assocs. v. Hamilton Sec. Grp.*, 370 F. Supp. 2d 18, 55 (D.D.C. 2005) ("Under the False Claims Act, damages must be proven with reasonable certainty."). One can imagine countless variables which would make that examination complex, and thus outside the reach of a lay jury, including, for example, the eight-year gap in time between the termination of the sponsorship and Armstrong's confession to having used PEDs, and the near-constant press about the USPS's impending bankruptcy and financial mismanagement during the intervening period (*see, e.g.,* The Postal Service Is Delivering Itself Into Bankruptcy, Audit Shows;[18] and USPS Going Postal with Enormous Debt[19]).

---

[18] http://www.investors.com/politics/commentary/postal-service-is-delivering-itself-into-

**4.     Gerbrandt's opinion that the cycling-team sponsorship has "no market value" is irrelevant and will not assist the trier of fact.**[20]

Mr. Gerbrandt opines that the mixture of positive and negative impressions that the USPS received between 1998 and 2014 "would have no market value," and thus "[n]o rational entity would pay for this mixture of exposure, given the type and large quantity of negative associations." Ex. 1 ¶ 8. But this opinion addresses the wrong legal standard, and is thus irrelevant to the task at hand. *Ambrosini v. Labarraque*, 101 F.3d 129, 145 n.6 (D.C. Cir. 1996) (J. Henderson dissenting) ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997) (expert testimony that misstates the law or applies an erroneous legal standard is inadmissible).

Instead, Mr. Gerbrandt's opinion is relevant to the government's pre-summary judgment conception of the legal standard relating to damages; the government then insisted that the jury would calculate "the difference between the market value of the sponsorship of a 'clean' USPS cycling team (i.e., what the government was promised) and the market value of the sponsorship of a 'doping' team (i.e., what the government actually received)." ECF No. 531 at 20. This is the standard Mr. Gerbrandt applied in reaching his conclusion that the value of the sponsorship is zero.

In its summary judgment order, the Court rejected the government's proposed legal standard. In accordance with controlling D.C. Circuit law, the Court ruled that the appropriate measure of damages is "the difference between the amount the government paid under the sponsorship agreements (i.e., $32.3 million) minus what the defendants' services were worth to the government as measured by the value of the services . . . the government received or used." ECF No. 547 (MSJ Order) at 26-27 (internal citations and quotations omitted). Because Mr.

---

bankruptcy/

[19] http://www.cnsnews.com/commentary/doug-bandow/usps-going-postal-enormous-debt

[20] This opinion is primarily set forth in paragraph 8 of Mr. Gerbrandt's opening report. Ex. 1

18

Gerbrandt made no effort to value what Mr. Armstrong's services were worth to the government, or what benefit the USPS received as a result of the cycling-team sponsorship, his conclusions that the cycling-team sponsorship had no market value, and that no rational entity would have entered into the sponsorship, are irrelevant—at best, they are relevant only to the wrong legal standard, and thus not admissible in this case. Fed. R. Evid. 403, 702(a).

Further, these conclusions suffer from the same inadequate analytical basis that dooms Mr. Gerbrandt's opinion regarding harm to the USPS. Mr. Gerbrandt testified that the amount of negative publicity surrounding Armstrong's doping "would have swamped any positive value that was created." Ex. 3 at 99:16-101:22*; see also* Ex. 1 ¶ 8. But Mr. Gerbrandt admittedly never made any effort to value either the negative or the positive publicity, so he has no reliable way to know whether the allegedly negative publicity swamped anything. And he could not explain this gaping hole in his analysis. So instead, he testified simply that "nobody would pay for that amount of negative publicity." Ex. 3 at 101:14-25. But this assertion reverts again to the improper legal standard and is entirely speculative. Mr. Gerbrandt's opinion that the cycling-team sponsorship had no market value lacks any methodological basis and is therefore irrelevant, misleading, and unduly prejudicial, and must be excluded. Fed. R. Evid. 702, 403.

### 5. Gerbrandt is unqualified to opine on the USPS's earned-media reports, and his opinions are not reliable or well-reasoned.[21]

Mr. Gerbrandt's opinions about the earned-media reports prepared by CE and FCB must be excluded. Mr. Gerbrandt is unqualified to opine on those reports, and his opinions are not either "properly grounded" or "well-reasoned." *Estate of Gaither*, 831 F. Supp. 2d at 62; *see also* Fed. R. Evid. 702(a), (c).

Until Mr. Gerbrandt was retained in this case, and read the earned-media report prepared by IEG on behalf of the USPS, he knew nothing about the academic literature regarding the

---

[21] This opinion is primarily set forth in paragraphs 7, 26-37 of Mr. Gerbrandt's report, and throughout Mr. Gerbrandt's rebuttal report. Exs. 1 and 2

valuation of a sponsorship. Ex. 3 at 76:14-77:8; *see also* 60:25-61:4, 82:2-12.  Mr. Gerbrandt

thus lacks any specialized knowledge that could assist the jury, as required by Rule 702(a). Mr.

Gerbrandt has never valued nonpaid media exposure resulting from a sponsorship—such as those

prepared by CE and FCB. *Id.* at 150:5-8. Accordingly, he has no firsthand experience with the

methodologies used by CE and FCB. It is thus unsurprising that Mr. Gerbrandt made no effort to

recalculate the value of the media that the USPS received as a result of the sponsorship, and

instead simply doled out a handful of critiques of the CE and FCB valuations. Ex. 3 at 206:13-

209:18.  Mr. Gerbrandt claimed that the reports made the following errors: they inappropriately

commingled different kinds of media, such as local versus national media stories (*Id.* at 150:17-

161:23); valued print coverage based on a standard Cost per Thousand ("CPM") number, rather

than a number that reflected the number of unique visitors, demographics, and types of

publications (*Id.* at 175:12-176:16, 185:24-187:9); arbitrarily counted articles with two mentions

of USPS as the equivalent of a quarter page ad, rather than ascribing a value based on column

inches of each article (*Id.* at 183:10-185:10); projected conclusions from small samples onto

larger ones (*Id.* at 150:17-152:16, Ex. 1 ¶ 29); and failed to ensure that each print article was

only counted once (Ex. 3 at 192:22-193:6). But Mr. Gerbrandt concedes that he did not rely on

any reliable principles or methods to make these critiques, as is required by Fed. R. Evid. 702(c),

and instead based them on his (unrelated) professional experience. *Id.* at 182:1-184:5, 201:15-

202:14.

Further, Mr. Gerbrandt criticizes the CE and FCB reports for precisely what he failed to

do in this case. Mr. Gerbrandt commingled multiple different types of media; appeared to weigh

all media reports equally (or use some undisclosed method to transform articles into

impressions); and failed to ensure the accuracy of the articles on which he relied. Ex. 1 ¶ 26-37.

Additionally, while Mr. Gerbrandt claimed to have laid eyes on all of the articles included in his

impression count to ensure they all related to Mr. Armstrong, he also conceded that it was not

20

actually feasible to do so and that therefore he had not done so. Ex. 3 at 225:7-13. Accordingly, Mr. Gerbrandt's critiques of the CE and FCB reports must be excluded.

For all these reasons, the Court should exclude Mr. Gerbrandt's report and testimony in its entirety.

## IV.    MOTION TO EXCLUDE BRIAN TILL

Brian Till's four-page report is full of conclusions yet short on reliable scientific theory applied to actual evidence. Dr. Till's three conclusions[22] purportedly rely on an "associative learning" theory. Associative learning is a theoretical framework which suggests that people's memories can create links between different concepts, so that seeing one concept will remind it of another. Ex. 4 (Till Report) at 2; Ex. 9 at 68 (Depo Ex. 728, Till, *Endorsers in Advertising: The Case of Negative Celebrity Information, Journal of Advertising, Volume XXVII, Number 1 Spring 1998*); Ex. 5 (Till Depo.) at 221:1-23. Critically (and dispositively for the purposes of this motion), Dr. Till conceded that associative learning does not allow researchers to make reliable predictions about the real world, including, for example, how bad press about a celebrity may (or may not) impact a brand that sponsors that celebrity. Ex. 5 at 218:12-220:8. Indeed, Dr. Till cites no evidence which suggests that associative learning can reliably be used in any context outside of academic research. Yet—without conducting any research, test, or survey, to apply his theory to the facts of this case, and without considering the very factors he claims should be considered pursuant to his associative learning theory—Dr. Till concludes that 'negative' information about Mr. Armstrong affected consumer perception of the USPS. Dr. Till's opinions are conclusory

---

[22] Dr. Till purports to make four conclusions, but one merely references a 1998 article he published, which is addressed further below. Dr. Till's three conclusions are, as follows: (1) "The USPS Sponsorship of Lance Armstrong's cycling team created an associative link between the USPS and Armstrong. There is evidence that consumers associated Armstrong with the USPS even after the Sponsorship ended." (2) "Due to the associative link between the USPS and Armstrong, it is highly likely that information about Armstrong's use of performance-enhancing substances and techniques negatively affected consumer perception of the USPS." (3) "It is highly likely that Armstrong's tarnished image reflected negatively on the USPS and deprived the USPS of the positive associative benefits expected through their Sponsorship."

assertions that lack any basis in a reliable methodology, and for the following reasons, must be excluded:

**First,** Dr. Till's opinions are not the product of reliable principles and methods. Fed. R. Evid. 702(c). He has provided no evidence to suggest that experts in his field draw "conclusions" about a real-world event, on the basis of associative learning theory, without experimenting on, or conducting a survey of the event. Indeed, for precisely this reason, Dr. Till's opinions have been excluded in other cases. The academic research cited by Dr. Till shows that experts in his field do not rely on laboratory studies to make predictions about the marketplace. Instead, the opposite is true: these experts routinely and expressly limit laboratory results to the specific facts tested. Because Dr. Till fails to apply the "same level of intellectual rigor that characterizes the practice of an expert in [his] field," his testimony is inadmissible. *Kumho Tire Co.*, 526 U.S. at 152.

**Second,** Dr. Till has not reliably applied any principle or method to the facts of this case. Fed. R. Evid. 702(d). Indeed, Dr. Till failed "to consider the very factors he claims should be considered" pursuant to his associative learning theory. *Gilmore* 53 F. Supp. 3d at 212. Dr. Till testified that specific factors are relevant to whether an associative link has been created between a brand and a celebrity it sponsors, such that negative information about the celebrity could impact consumers' perception of the brand. Yet Dr. Till conceded that he failed to consider those same factors as they relate to Mr. Armstrong and the USPS. *See United States v. Stagliano*, 729 F. Supp. 2d 222, 230 (D.D.C. 2010) (excluding expert where her "methodology—what little [could] be gleaned from it—[was] so nebulous, subjective, and lacking in rigor and detail as to cast serious doubt, not only on the reliability of her opinion testimony, but on its usefulness to the jury as well").

**Third**, Dr. Till's opinions should be excluded for the independent reason that, even if they were the product of adequate principles or methods (which they are not), and even if they were reliably applied to the facts of the case (which they were not), they would not "help the trier

22

of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a); *see also* Fed. R. Evid. 401, 403. The only issue to which Dr. Till could be relevant is damages, and here Dr. Till's opinions do nothing to help the jury assess the only relevant question—whether the value of the services the government received exceeded the amount the government paid. ECF No. 547 (MSJ Order) at 26-27.

      For these reasons and as more fully discussed below, the Court should exclude Dr. Till's report and testimony in its entirety.

### A.    Till's 1998 Research

      Dr. Till's analysis rests upon a single article he co-authored in 1998. That article, *Endorsers in Advertising: The Case of Negative Celebrity Information*, summarized research regarding whether and to what extent negative information about a hypothetical bicycle racer impacted consumer attitude about an endorsed brand, a bicycle.[23] Ex. 4 at 3; Ex 9 (Depo Ex. 728) Dr. Till conducted three experiments to explore how exposure to various types of information might impact the transfer of negative information from the racer to the brand. The purpose of this "laboratory experimentation" was "***not to generalize findings to business practices***, but rather to test practitioners theories in use." Ex.9 at 81 (emphasis added, quotations omitted). Indeed, Dr. Till emphasized that his research was subject to numerous limitations, including the laboratory setting and compressed time frame (45-50 minutes), and thus his findings "***may not [be] be generalize[d] to the "marketplace.***" *Id.* at 80**.** Dr. Till recognized and acknowledged that the real-world marketplace is different from his hypothetical world.[24] For

---

[23] Till admitted at his deposition that he did not accurately report the findings of his 1998 study in his expert report.  Ex. 5 at 189:17-190:10.  In his report, Till claimed that the study showed that negative information about a celebrity "consistently" affected the endorsed brand. Rpt. at 1, 4.  That is <u>not</u> what his 1998 study concluded.  As set forth in greater detail herein, in the one test in which Till subjected respondents to a real celebrity, rather than a fictional one, negative information about the celebrity did not impact the brand.

[24] The articles upon which Till relies caution that study results cannot reliably be applied to the real world. *See, e.g.,*Ex.10 at 228 ( Amos, et al., *Exploring the relationship between celebrity endorser effects and advertising effectiveness* (2001)).

example, in real life, consumers face "communication clutter," celebrities endorse multiple brands, brands employ multiple celebrities, and sources of information vary in credibility. "All of those factors may mitigate the impact of negative celebrity information and **_limit the generalizability of a laboratory study._**" *Id.* at 80-81 (emphasis added).

Even within Dr. Till's 1998 study, the test results are inconsistent and entirely fact-dependent. Dr. Till first conducted two tests which subjected respondents to a fictitious racer and a fictional bicycle brand. He used a fictitious celebrity because of "potential problems with using a real celebrity," including, for example, that the subjects might already be familiar with that celebrity (which may prevent the formation of a link between celebrity and brand). *Id* at 70. Dr. Till provided the subjects with background information regarding the brand and celebrity, attempted to establish in the subjects' memories a "link" between the celebrity and the brand, exposed the subjects to negative information about the celebrity, and then tried to determine whether that information had affected the subjects' opinion about the brand. With respect to the fictional celebrity, Dr. Till determined that negative information about a celebrity had an adverse effect on the fictional brand—through lowered brand evaluations—when the subjects were unfamiliar with, or had limited knowledge about, both the brand and the celebrity. *Id.* at 72. Further, the impact of the negative celebrity information on brand attitude was greater when that information was presented before a "link" was formed between celebrity and brand. *Id.* at 76.

Then, in a third test, Dr. Till introduced a real celebrity, cyclist Greg LeMond. *Id.* at 76. Here, Dr. Till found that his prior results did not hold true in testing with LeMond—**_negative information about Mr. LeMond had at best a weak impact on the bicycle brand_**. *Id.* at 80. He thus theorized, based on the three studies, that negative information about a celebrity may be problematic for the associated brand only when consumers are **_unfamiliar_** with **_both_** the brand and celebrity. *Id.* at 79-80 ("The results of study 3 do not support the prior studies' findings about the deleterious effects of negative celebrity information on the endorsed brand. We

24

speculate that subjects had a fuller association set for Greg LeMond than for the fictitious [celebrity], which may have blunted the effect of the negative celebrity information.").

    **B.**    **Argument**

        **1.**    **Till's opinions are not the product of reliable principles and methods.**

            **a.**    **Till failed to conduct any tests, research, or analysis.**

Dr. Till uses associative learning principles to reach conclusions about real-world events, without actually analyzing the people, brand, and information relating to the event itself. Ex. 5 at 224:5-21. This half-baked attempt fails to meet the standard for expert admissibility. *See, e.g., Sykes v. Napolitano*, 634 F. Supp. 2d 1, 8 (D.D.C. 2009) (excluding purported expert where expert did "not offer 'expert' testimony based on his years of experience" but "[i]nstead . . . decide[d] credibility on an incomplete written record, offer[ed] conclusions that have no basis in fact revealed from his report, and advocate[d] for the Plaintiff rather than providing expertise to the fact-finder").

Indeed, Dr. Till's testimony has previously been stricken on these grounds. In *Frosty Treats, Inc. v Sony Computer Enm't America, Inc.*, Dr. Till submitted an expert report which opined that the introduction of a new model of a video game had caused an increased demand for older models of the same product (and thus plaintiff argued that defendant should disgorge profits from earlier versions of a video game). No. 03-CV-378, 2004 WL 5500100 (W.D. Mo. Mar. 3, 2004). Yet Dr. Till had conducted no tests in forming his opinions; did no research that might show that the new game bestowed a positive effect on sales of any older game; and gathered no evidence showing that the new game had any prominence in the minds of consumers which would encourage them to purchase the older game. *Id.* at *3. The district court excluded Dr. Till's testimony explicitly rejecting plaintiff's argument that Dr. Till could make reliable predictions without performing case-specific work. *Id.*[25]

---

[25] Dr. Till's testimony was also excluded on similar grounds in *Doe v. TCI Cablevision,* 2000 WL 35715278 (Mo. Cir. 2000). There, the state appellate court granted defendant's judgment

Likewise, here, Dr. Till conducted no tests, did no research, and gathered no evidence, yet opined that it is "highly likely" that Armstrong's tarnished image deprived the USPS of benefits expected through the cycling team sponsorship. Experts in Dr. Till's field do not use theoretical principles to make conclusions about real-life events without conducting tests, doing research, and gathering evidence. *Kumho Tire Co.*, 526 U.S. at 152 (the objective of *Daubert*'s gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). Dr. Till's 1998 article shows this to be true, as do the academic articles upon which Dr. Till relies. Those articles consistently present the results of a survey or experiment, and then consider what the results of that survey or experiment *may* mean for the theory tested. None of them purport to reach any conclusions about real-world events without specifically examining and studying the facts associated with that event.

For example, an article cited by Dr. Till, *Public Information and Consumer Skepticism Effects on Celebrity Endorsements, Journal of Marketing Communications, Published online: 14 Jun 2007*, authored by University of Toledo professor Ainsworth Anthony Bailey, reports on both a survey and experimental analysis, conducted to test the extent to which public information about celebrity endorsers can influence consumers' attitudes. As part of his survey, Dr. Bailey asked respondents a series of questions designed to elicit the extent to which celebrities' involvement in controversies had impacted respondents' perception of the brands/product endorsed by these celebrities. The reported results demonstrated that, for 73% of respondents, negative events involving celebrity endorsers had little or no effect on attitudes towards the

---

notwithstanding the verdict on plaintiff's damage claim, in part due to the district court's admission of Dr. Till's testimony at trial. Dr. Till had opined that the defendant derived economic benefit from the use of plaintiff's name, without conducting any empirical study to support his conclusions. *Id.* The appellate court determined that, Dr. Till's testimony lacked foundation and was a mere "exercise[] in speculation." *Id.*

26

brands and companies with which these celebrity endorsers were associated. Ex. 11 at 92. Based on those results, Dr. Bailey suggested that the extent of the association between the brand and the celebrity, and the nature of the controversy, ***might*** impact whether customers' attitudes would be affected. Dr. Bailey explicitly limited his findings to the conditions of the experiments he performed. *Id.* at 103-04. In another example, *Evaluating potential brand associations through conjoint analysis and market stimulation: Journal of Product & Brand Management Volume 13 · Number 7 · 2004 · pp. 506-513*, the author reports on an analysis he conducted to examine how consumers develop preferences for goods and services. There again, the author presented results of his own empirical research, explained why the results suggested that association can be an effective marketing tool, and expressly limited those results to the theory he tested. *See* Ex. 12 at 511 ("Perhaps more than any other analytic technique, the results of conjoint analysis are driven by the design of the study.").

Dr. Till's failure to do the work required of an expert in his field renders his opinions unreliable for another reason: academic studies that ***actually have*** analyzed the real-world impact of negative information suggest that negative information about a celebrity does not impact a brand which sponsors that celebrity, or can benefit a sponsoring brand.[26] Michael Leeds, a professor of economics at Temple University, used event study techniques to examine whether Floyd Landis's 2006 Tour de France win, followed days later by his suspension from the Phonak cycling team due to a failed drug test, had affected Phonak AG. Ex. 8 (Depo. Ex. 733). Dr. Leeds determined that neither Landis' Tour win, nor his positive drug test, impacted Phonak. In fact, Phonak had experienced a positive and statistically significant "Cumulative Abnormal Return" in

---

[26] For example, a 2003 Wall Street Journal article regarding Kobe Bryant reported: "The good news for the marketers who employ Kobe Bryant as a celebrity endorser is that the repercussions of his arrest on charge of sexual assault, based on the experience of other stars and scandals, is unlikely to tar their brands."  A spokesman for Reebok, one of Bryant's endorsers, explained: "[S]ales pretty much stayed consistent during and after [Bryant being charged with weapons violations] . . . . His sneakers remain one of our top selling shoes." Ex. 13.

the period surrounding Landis' drug test. Accordingly, Dr. Leeds determined that "even bad publicity is better than no publicity at all." *Id.* at 807; *see also* Ex. 5 at 134:7-21.

Dr. Till has provided no evidence whatsoever to suggest that experts in his field draw "conclusions" about a real-world event, on the basis of associative learning theory, without actually experimenting on, or conducting a survey or test relating to the event. In this case, Dr. Till has done precisely that, and as a result, his opinions are unreliable and speculative. An expert must use the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Dr. Till has failed to do so.

### b. Till ignored data directly relevant to his associative learning theory.

Dr. Till did not conduct any empirical analysis of the relationship between the USPS and Armstrong, presumably because he suspected that such analysis would show that any "negative" information about Armstrong in 2013 had a negligible effect, if any, on consumers' perception of the USPS. Here, Dr. Till had access to data which he could have used to perform an analysis, but he largely chose to ignore it. The government supplied Dr. Till with results of a survey conducted by market research firm Ipsos. Ex. 5 at 195:23-196:12, 259:16-22. The survey asked questions directly relevant to Dr. Till's associative learning principles. Indeed, Dr. Till conceded both that the responses to those questions are relevant to his associative learning theory, and also that he failed to consider them. *Id.* at 269:9-14, 269:20-23.

 For example, the survey asked respondents whether they had heard of the USPS; used the USPS for mailing services; heard of Armstrong; and to identify what Armstrong is most famous for. Ex. 14 (Depo. Ex. 734). The survey also asked respondents which USPS sports sponsorships they were aware of, and to identify words that describe the USPS and Armstrong. *Id.* Each of these questions relates directly to the size of the "association set" (or "knowledge structure") of the USPS and Armstrong; Dr. Till has theorized that the larger the association set, or set of concepts with which we associate an individual or entity, the less likely one is to associate them with a specific concept. Ex. 5 at 101:22-102:1, 270:15-22, 274:5-12. The survey

also asked respondents to identify entities that sponsored Armstrong's cycling team. This is relevant to Dr. Till's associative learning concept "blocking," which suggests that there is a decreased likelihood that a link will form between a brand and celebrity if the celebrity is already associated with other brands. And the survey asked whether allegations of PED-use by Armstrong or members of his cycling team changed respondents' opinion of the USPS. This too is relevant to "extinction" or weakening of a link between a celebrity and brand (and importantly, ***93.2% of respondents said that the allegations of PED-use had either no effect or responded N/A***). *See* McCloskey Decl., ¶¶ 20-21. Although Dr. Till was provided with all of this data— which he conceded is directly relevant to his associative learning theory—he did not consider it in forming his opinions. Ex. 5 at 267:6-10, 268:1-4, 269:20-23, 270:24-271:2, 271:20-25, 272:16-21, 273:19-24, 276:15-18.

Instead, Dr. Till cited the Ipsos study for the following limited points. First, Dr. Till noted that when the Ipsos survey was conducted, in 2012, 12.3% of respondents were aware of the USPS cycling team sponsorship; and individuals reporting shipping responsibilities in the workplace were more likely to be aware of the sponsorship. Ex. 4 at 3. But Dr. Till's own theoretical framework shows that whether respondents were aware of the sponsorship means little about whether "negative" information about Mr. Armstrong impacted consumers' perception of the USPS. Indeed, as set forth above, Dr. Till determined in his 1998 study that negative information about Mr. LeMond—the one real celebrity tested—had an insignificant impact on the bicycle brand, even though the respondents were explicitly informed that the bicycle brand was a sponsor of Mr. LeMond. Ex. 9 at 80 (Depo Ex. 728). There, Dr. Till theorized that brands may be insulted from negative information about a celebrity where consumers are familiar with the brand or the celebrity. *Id.* at 79-80. But here, Dr. Till ignored the Ipsos data showing that respondents were very familiar with the brand and celebrity here at issue—indeed, 99.5% of respondents were aware of the USPS and 89.4% were aware of Mr. Armstrong. *See* McCloskey Decl., ¶¶ 20-21; Exs. 14-16 (Depo. Exs. 734-36).

Second, Dr. Till commented that the Ipsos respondents who indicated that Mr. Armstrong was guilty of PED-use rated him lower on personal characteristics, and also rated USPS lower on certain brand attributes, including "dependable" and "high quality." But again, these responses are irrelevant to Dr. Till's associative learning theory. They do not show that the link between Mr. Armstrong and the USPS was strong, or that there was "fit" between Mr. Armstrong and the USPS, or that Mr. Armstrong and the USPS had fewer pre-existing links with other brands or concepts—the associative learning factors Dr. Till addresses in his report. Ex. 4 at 2. Further, in light of the host of negative information about the USPS entirely unrelated to Armstrong—which relates specifically to whether the USPS is dependable and high quality—ascribing these consumer ratings to Mr. Armstrong's doping admission is entirely speculative. And Dr. Till makes no effort to consider or address this type of negative information about the USPS, including, for example, a series of incidents between 1986 and 2006 in which USPS workers shot and killed their managers and co-workers, giving rise to the phrase "going postal"; consistent reports of the USPS's impending bankruptcy due to its own financial mismanagement (the USPS has lost more than $60 billion over the past 10 years[27]); and frequent postage rate hikes, which made consumers increasingly likely to turn to other shipping providers, such as UPS and FedEx.

In short, Dr. Till cherry-picked a couple responses from the Ipsos study to give his report the appearance of reliability, but omitted those actually relevant to his own associative learning theory, as well as the responses showing that Armstrong's PED-confession had minimal impact, if any, on consumers' perception of the USPS.

---

[27] http://www.marketwatch.com/story/post-office-losses-widen-to-58-billion-this-year-2016-11-15.

2.    **Till failed to reliably apply any principles or methods to the facts of this case.**

Not only does Dr. Till fail to conduct any kind of reliable survey, or consider the survey provided to him, but even the minimal work he did failed "to consider the very factors he claims should be considered." *Gilmore,* 53 F. Supp. 3d at 212. For example, according to Dr. Till, in determining whether a link has formed between a brand and a celebrity, it's important to consider whether there are competing stimuli, *i.e.*, other sponsorships that either the brand or celebrity has entered into. Ex. 4 at 2. The more sponsorships either the brand or the celebrity has entered into, the less likely it is that information about the brand will affect the celebrity, and vice versa.[28] Yet Dr. Till admitted that he did not consider whether Armstrong or the USPS had entered into other sponsorships, though he agreed that Armstrong's other sponsorships constitute competing stimuli.[29] Ex. 5 at 147:23-150:16, 152:1-6, 154:9-155:2, 160:15-20, 167:5-18. According to Dr. Till, it's also important to consider whether there is "congruence" (*i.e.*, fit, similarity) between the brand and the celebrity. Ex. 4 at 2. Yet Dr. Till admitted that he did not consider whether there was congruence between the USPS and Armstrong, and he agreed that there was stronger congruence between Armstrong and his other sponsors. Ex. 5 at 174:2-176:24. According to Dr. Till, it's also important to consider whether an associative link between a brand and a celebrity has weakened over time. Ex. 17 at 183 (Depo. Ex. 726); Ex. 5 at 146:12-15. Yet Dr. Till admitted that he did not consider whether the link that may have existed between the USPS and Armstrong had weakened over the eight-year period between the termination of the sponsorship and the publicity regarding Armstrong's PED-confession. Ex. 5 at 63:24-64:19, 66:3-18, 181:17-182:15.

---

[28] Indeed, according to Till where consumers have a larger association set for a celebrity than they have for a brand (which may very well be true for Armstrong and the USPS), "thinking of the brand is more likely to activate the celebrity node than thinking about the celebrity is to activate the brand node." Ex. 9 at 69 (Depo. Ex. 728).

[29] Till had no idea that Armstrong had been sponsored by Nike, Giro Trek, Oakley, Anheuser-Busch, 24 Hour Fitness, Easton-Bell Sports, RadioShack, and Honey Stinger.

Because Dr. Till failed to consider the associative learning principles which he claims must be considered, his opinions are unfounded and unreliable, and must be excluded. *Gilmore,* 53 F. Supp. 3d at 212.

### 3. Till's opinions are irrelevant will not assist the trier of fact.

Finally, Dr. Till's opinions should be excluded for the independent reason that, even if they were the product of adequate principles or methods applied (which they are not), and even if they were reliably applied to the facts of the case (which they were not), they would not be "help[ful] [to] the trier or fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a); *see also* Fed. R. Evid. 401, 403. The only issue to which Dr. Till could be relevant is damages. The measure of damages is "the difference between the amount the government paid under the sponsorship agreements (i.e., $32.3 million) minus what the defendants' services were worth to the government as measured by the value of the services . . . the government received or used." ECF No. 547 (MSJ Order) at 26-27 (internal citations and quotations omitted).

Here, Dr. Till's opinions do nothing to help the jury assess what Armstrong's services were worth to the government. Dr. Till has made no effort to perform an analysis to ascertain whether negative information about Mr. Armstrong actually harmed the USPS, nor has he attempted to qualify that harm or compare it to the benefits the USPS received from sponsoring the cycling team. Whether negative publicity about Mr. Armstrong could hypothetically have influenced customer perceptions of the USPS does not assist the jury in determining what Mr. Armstrong's services were worth. Accordingly, because Dr. Till's opinions are irrelevant, unhelpful, and thus misleading, they must be excluded.

## V.    MOTION TO EXCLUDE JONATHAN WALKER

### A.    Walker's Background and Experience

Dr. Jonathan Walker is a professional litigation consultant. Ex. 7 (Walker Depo.) at 68:11-14. He has spent the last two decades working at Economists, Inc., a litigation consulting firm. Ex. 6, Ex. A (Walker Report; Ex. 7 at 67. He has never served on the faculty of any

institute of higher education. Ex. 7 at 67. He is not an attorney, and has no formal legal education. *Id.* His resume lists twelve "publications." None of those publications are in peer reviewed journals. *Id.* at 57. Seven appear in a marketing pamphlet sponsored by his firm, and posted on its website. *Id.* at 53, 61. One was a continuing legal education handout. *Id.* at 62-63. The rest appear in trade journals. *Id.* at 63-65. Dr. Walker has never published any papers about advertising or marketing. *Id.* at 70. He has never performed a media valuation study. *Id.* He has never worked for an advertising, sports marketing, or sponsorship evaluation firm. *Id.* at 72.

Dr. Walker did not "try[] to evaluate the net impact of [Armstrong's] transgressions on the Postal Service, to try to ascertain the degree to which they are better off or worse off either due to the transgressions or due to having entered into the sponsorship agreement at all." *Id.* at 220-221. Instead, he performed two hypothetical exercises. He opined that if the use of performance enhancing substances had been disclosed before the Postal Service signed the sponsorship agreement, it never would have entered into the sponsorship, and its value would have been zero. That conclusion is in turn based in part on a second hypothetical that claims to rely upon "event study methodology."

"Event study methodology is a way to measure the impact of a particular piece of information on the value of [a] common stock." *Id.* at 156. "Economists identify instances where . . . events occurred and they measure the effect that the event had on the stock price of publicly traded companies impacted by the event." Ex. 6 ¶ 56. Dr. Walker opined in his report that "[e]vent study methodology indicates [that] USPS damages exposure may be in the billions of dollars." *Id.* ¶10. And indeed, he claims to have quantified "estimates of the effect of Tailwind/Armstrong Scandal on USPS." *Id.* ¶ 69. In Dr. Walker's report, the "minimum loss" to Postal Service equity was $260 million. The "maximum loss" is reported as $5.38 billion. *Id.* at 24 tbl.2.

But there is a glaring problem with the application of event study methodology to the U.S. Postal Service. The Postal Service does not have a stock price, or any other observable

33

market capitalization. Ex. 7 at 261; *accord* Ex. 6 ¶ 67. So Dr. Walker invented a fictional equity value of the Postal Service by blending the market values of Federal Express, DHL, and UPS, which do trade on a public exchange. Ex. 6 at 24 tbl.1. Dr. Walker then encountered a second problem. Since the fictional Postal Service equity value didn't trade on any exchange, that value never actually dropped (or rose) in relation to any external event—much less some event tied to Lance Armstrong. So Dr. Walker made up a drop in the fictional equity value. That fictional drop in value is not based on the actual stock movement of any firm caused by the disclosure PED use by any U.S. Postal Service rider.[30] Nonetheless, he blamed the fictional drop in the fictional equity value on Lance Armstrong.

At deposition, Walker admitted that the Postal Service did not actually suffer the losses set forth in his report. Walker Depo. 238. Contrary to the representations in his report, when he testified under penalty of perjury, he said that "I did not come up with a specific number and say this is the enterprise value of the Postal Service." Ex. 7 at 288. He frankly admitted that none of the numbers in Table 1 in his report, entitled "Estimate of USPS Enterprise Value," actually correspond to the market capitalization of the Postal Service. *Id.* at 289. He also admitted that no firm "actually experience[d] the drop in market capitalization that [he] report[ed] in Table 2" of his report. *Id.* at 297.

Dr. Walker was also candid about his methodology. He admitted that he did not conduct an event study. *Id.* at 170 ("In forming your opinions in this matter, did you conduct an event study. No."). Dr. Walker also testified, contrary to the damages claim in his report, that he "did not use *any study* to come to some conclusion on an ex post basis that the impact of the Tailwind/Armstrong scandal on USPS was *any particular number*." *Id.* at 238 (emphasis added). Indeed, according to Dr. Walker, "it is impossible to use event study methodology to

---

[30] Indeed, the only event study that actually measured the result of such a disclosure showed that the stock price of Phonak, the team Floyd Landis rode for when he won the Tour de France, rose after his use of performance enhancing substances was disclosed.  Ex. 7 at 169-170.

directly assess the impact of Tailwind's and Mr. Armstrong's disclosures regarding drug use, other cheating and dishonesty on USPS." Ex. 6 ¶ 88; Ex. 7 at 242-243. "Event study methodology cannot be applied directly here because the methodology is based on stock prices, but USPS is not a publicly traded company." Ex. 7 at 243:11-17. Therefore, "[a]ny USPS loss is not directly ascertainable through application of event study methodology." *Id.* at 243; Ex. 6 ¶ 88. The government would like to present Dr. Walker's testimony to a jury in support of its damages case.

### B.     Argument

#### 1.     Walker's entire report is premised on an irrelevant damages standard.

"Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997). "Expert testimony that consists of legal conclusions cannot properly assist the trier of fact . . . , and thus it is not otherwise admissible." *Id.* at 1212. Even worse, expert testimony that misstates the law or applies an erroneous legal standard is inadmissible. *Id.* at 1213.

Dr. Walker's opinion addresses an irrelevant legal standard. Prior to this Court's summary judgment order, the government insisted that the legal standard governing damages in this case required the jury to calculate "the difference between the market value of the sponsorship of a 'clean' USPS cycling team (i.e., what the government was promised) and the market value of the sponsorship of a 'doping' team (i.e., what the government actually received)." ECF No. 547 (Order) 27. Dr. Walker dutifully applied that standard, arguing that the sponsorship was worth "zero" because neither the Postal Service nor anyone else would have paid for the sponsorship has it known of the use of performance enhancing substances. But the Court rejected the government's proposed legal standard, and Dr. Walker's application of it in this case. As this Court ruled, "[t]hat the government would not have entered into the contract had it been aware of the potential conflicts was immaterial to damages." *Id.* at 28. The

government "is not entitled to the return of all of its money, tripled no less, simply because it never would have sponsored a 'doping' team." *Id.* Instead, as this Court held, "the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used." *Id.* at 26; *SAIC*, 626 F.3d 1257, 1278 (D.C. Cir. 2010). Because Dr. Walker's report applies a legal standard rejected by this Court, and by the D.C. Circuit, it is irrelevant, prejudicial, and inadmissible. *See Lewis v. Booz-Allen & Hamilton, Inc.*, 150 F. Supp. 2d 81, 92 (D.D.C. 2001) (excluding Dr. Walker's opinion testimony as irrelevant and prejudicial).

## 2.     Walker admitted that it was "impossible" to apply event study methodology to ascertain actual harm to the Postal Service as a result of PED use.

Dr. Walker's event study (or lack thereof) shows exactly why the D.C. Circuit and this Court are correct to insist that the jury consider actual evidence of amounts paid and benefits received, instead of hypothetical market valuations. Dr. Walker's purported application of event study methodology is composed entirely of speculation. Dr. Walker frankly admitted that the event study methodology on which he relies has no application in this lawsuit, and, as a result, produces hypothetical estimates of losses that no firm actually suffered. Dr. Walker made no attempt to determine whether the Postal Service actually suffered any harm or, as required by the applicable legal standard, received any benefits as a result of the sponsorship. Instead he completed a hypothetical exercise on a fictional market valuation that yielded a speculative number that even he is careful to insist is not a measure of actual harm. Dr. Walker did not "reliably appl[y] [his] principles and methods to the facts of the case," and therefore his testimony is inadmissible. Fed. R. Evid. 702(d).

An important clue to ascertaining reliability is whether the expert has published his conclusions, or subjected them to peer review. *Raynor*, 104 F.3d at 1375. Dr. Walker cited no articles that use the methodology he espoused. Ex. 7 at 310. Indeed, Dr. Walker was unable to identify any peer-reviewed article that conducted an event study on publicly-traded companies

36

and applied the results of that study to a non-publicly traded company. *Id.* at 314. Dr. Walker could not name any other economist who performed an event study on a fictional stock price, except perhaps for a "hypothetical example." *Id.* at 315. Nor could he identify any other economist who performed an event study on a fictional drop in market capitalization. *Id.* at 315-16. Because Dr. Walker by his own admission was unable to apply the event methodology he claimed to have used in his report, nor it seems has anyone else, his testimony is unreliable, and therefore, inadmissible.

## VI.     CONCLUSION

For the forgoing reasons, Armstrong respectfully requests that the Court exclude the reports and testimony of Larry Gerbrandt, Brian Till and Jonathan Walker.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: June 9, 2017

By:   s/ *Elliot R. Peters*
JOHN W. KEKER (*pro hac vice*)
ELLIOT R. PETERS (*pro hac vice*)
R. JAMES SLAUGHTER (*pro hac vice*)
SHARIF E. JACOB (*pro hac vice*)
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

ROBERT D. LUSKIN (D.C. Bar # 293621)
PAUL HASTINGS LLP
875 15TH St., NW
Washington, DC  20037
Telephone: (202) 551-1966
Facsimile: (202) 551-0466

Attorneys for Defendant
LANCE ARMSTRONG